OPINION
{¶ 1} Defendant-appellant, Anthony M. Hickman, appeals his convictions and sentences in the Stark County Court of Common Pleas on one count of aggravated murder in violation of R.C.2903.01 (A) with a firearm specification and four counts of felonious assault in violation of R.C. 2901.11 (A)(2), each with a firearm specification. Plaintiff-appellee is the State of Ohio.
 {¶ 2} This case arose from a drive-by shooting in the early morning hours of June 19, 2003. Appellant Anthony Hickman was a passenger in a white Chevrolet Corsica which drove past the residence of John Cordia, II and shot into a crowd of people, killing Jesse Blankenship and seriously wounding Jason Hashman, John Cordia, II, and James Brady.
 {¶ 3} John Cordia, II was at the home of his friend Chester McMasters, helping McMasters work on his race car. Appellant appeared at McMasters' house and he and Cordia got into an argument. Appellant and Cordia had known each other for some time.
 {¶ 4} On Wednesday, June 18, 2003, around 5:00 p.m. Mr. Hickman parked his car, a red 1992 Chevrolet Berretta in the alleyway near Cordia's house. Mr. Cordia and Mike Swan were in the alleyway working on Cordia's race car. Appellant was in the area hanging out with his friends and relatives including his girlfriend Crystal, his younger cousins William and Shawn Scott, Robert Bower, Jeffrey Carbenia, and Joey Hilton. A physical confrontation ensued in which appellant was not personally physically involved. No one was injured in this confrontation. Cordia suspecting that the group might "jump" him, or attack him while he was outnumbered ran into his house to call friends and family members to come fight on his behalf. Cordia called McMasters and Jason Hashman. McMaster came over to Cordia's while appellant's group was still there. A fist fight began and punches were thrown. The fight lasted five or ten minutes and ended when someone yelled the cops were coming. The police did appear briefly but soon left.
 {¶ 5} Appellant and his group continued to "patrol [Cordia's] neighborhood" in the red Berretta and a green Ford Taurus making threats culminating in another fight in front of Cordia's house. At this point, Cordia, Hashman, John Mullin and Josh Tolley were standing on Cordia's porch. McMasters was outside the fence sitting in the back of the pickup truck and was struck in the back of the head with a baseball bat. Jeffrey Carbenia, who was with appellant's group, ran up onto Cordia's porch and knocked a small child off the porch. Cordia in turn threw Carbenia off the porch. Cordia's father came out of the house and told everyone to leave.
 {¶ 6} Appellant's group returned to the home of Joseph Mallette. Appellant testified "And they are saying how they want to go back down there and still fight them, and they just wanted to fight. They wanted to go back down there and fight them. So we headed back down there." (4T. at 692).
 {¶ 7} The group proceeded back to the area, and upon noticing a large crowd of people with baseball bats and bricks, left the area. The appellant's group picked-up Greg Williams and then went over to where Leroy Mallette was staying and picked him up. (4T. at 693). The group was unable to locate Michael Mallette. The group again returned to the area and again left upon seeing a large group of individuals.
 {¶ 8} Appellant's group again went to Joey Hilton's house. Appellant testified "so we figure we'd catch a group of them, we'd fight them and that would be it instead of heading up with all the guys there. There was too many." (Id. at 695). The group returned to the area in Joey Mallette's car. In the car, were appellant Joey Mallette, John Fields, Leroy Mallette and Joey Hilton. Along the way appellant attempted to recruit Justin Rucker to accompany his group back to the area of the previous confrontations. Mr. Rucker was not interested.
 {¶ 9} Unbeknownst to appellant's group, Cordia's cousin, Carl Cordia, had blocked the other end of the alley with his car. When appellant's group reached the end of the alley, both Joey Mallette and Carl Cordia revved their engines and drove at one another like a game of "chicken". The two cars collided. Carl Cordia, along with at least two other men from Cordia's group then struck Joey Mallette's green Ford Taurus with crow bars and baseball bats breaking out its windows.
 {¶ 10} Appellant and Leroy Mallette exited from the back seat of the car and fled on foot. Joey Mallette put his car in reverse and backed all the way out the alley picking up appellant and Leroy Mallette before leaving the neighborhood. They drove back to Joey Mallette's house.
 {¶ 11} When they arrived back at Joey Mallette's house, Joey's older brother, Michael Mallette was standing on the front porch. Upset about the severe damage to his car, Joey Mallette wanted Michael to call his friends and go back to Cordia's neighborhood to fight. Michael Mallette initially refused to help Joey. Joey Mallette then drove off in his damaged car accompanied by Mr. Hilton. Appellant, Fields and Leroy Mallette got into a white Corsica, which belonged to Mr. Fields' girlfriend to go look for Joey Mallette. At about 2:00 a.m. on June 19, 2003, Fields realized that he was being followed by Michael Mallette's Cadillac and pulled over in the church parking lot. In that parking lot, Fields and Michael Mallette talked about getting a gun and agreed to meet later at a house on the southwest side of Canton where Leroy Mallette was staying. Appellant and Leroy Mallette got inside the Cadillac and Michael Mallette drove them to Leroy's residence.
 {¶ 12} Appellant went inside Leroy Mallette's residence to make a telephone call. When he finished speaking on the telephone, appellant walked outside and saw that Fields arrived with a gun. He witnessed Leroy Mallette load the gun, a 9 mm. semiautomatic short-barrel rifle.
 {¶ 13} Those present at Leroy Mallette's residence included appellant, Fields, Hilton, Joey, Leroy, and Michael Mallette. Michael Mallette told Joey to drive the Cadillac back to Michael's house. Fields got into his girlfriend's white Chevrolet Corsica. Joey Mallette, Leroy Mallette and Hilton then got into Michael's Cadillac.
 {¶ 14} Appellant testified he was about to get into the Cadillac as well, but Michael Mallette said to him "You're going to." (Id. at 706-08-755).
 {¶ 15} Appellant testified that Michael Mallette was holding the loaded rifle and became angry and screamed at appellant that it was appellant's fault that his, Mallette's brothers had gotten involved in this, and that appellant was going with them back to the neighborhood.
 {¶ 16} Appellant claims that due to his fear of Michael Mallette, he got into the backseat of the white Chevrolet Corsica. Fields drove the car and Michael Mallette sat in the front seat, with the loaded rifle on the front seat between them. They drove to Cordia's house, and Mallette told appellant to lie down. Appellant claimed that he felt the car stop and could see Mallette's back and he just laid there scared as Mallette fired the rifle. After the shooting, appellant popped back up when Fields stopped at a stop sign and looked back to see what had happened. Appellant thought that Mallette hadn't shot anyone, but just scared them.
 {¶ 17} At approximately 2:40 a.m. Jesse Blankenship, Cordia, and Hashman, and James Brady who are all standing in Cordia's yard or near his driveway were shot. Jesse Blankenship was shot twice, once through the trunk of his body, and once through his left thumb. He later died from the gunshot wound to the trunk of his body. Cordia was shot in the upper right arm. Hashman was shot twice. Once through the right angle, and once in the left thigh. Brady was shot three times. Once in the jaw, once in the arm, and once in the leg. Canton Police later recovered eight CBC shell casings.
 {¶ 18} After they left the shooting scene, Mr. Hickman asked to get out of the car. Michael Mallette would not allow him to leave the car. Eventually, Fields drove them to 34th Street and Midvale Avenue N.E. where Michael Mallette exited the car. Taking the rifle with him, Mr. Mallette walked over to a field of roadside shrubs, tall grass and weeds on the east side of Millvale. Michael Mallette then hid the rifle in the tall grass and weeds beyond the roadside shrubs.
 {¶ 19} After Michael Mallette returned to the car, Fields drove them to Harmont Avenue where they passed a Canton Police cruiser at approximately 2:51 a.m. The police cruiser driven by Officer Carl Saler turned around and followed them. Patrolman Saler had been one of the first officers to arrive at the shooting scene. He had been given a description of the white Chevrolet Corsica containing 3 or 4 people and knew that the appellant was one of them. Parolman Saler circled the area that Corsica could have reached since the shooting. Patrolman Saler observed the car 1 to 2 miles away from the location of the shootings. The officer passed the suspects car on Harmont Avenue N.E. Patrolman Saler noted that there were 3 passengers inside the car. The driver, front seat passenger, and the rear seat passenger. Saler kept the vehicle in sight, and effectuated a traffic stop with his lights and sirens at 2:55 a.m. John Fields was driving the Corsica. When Patrolman Saler asked Fields where they were going, Fields replied that they were going to buy beer. Saler told the front seat passenger, later identified as Michael Mallette, to place his hands on the dash. The rear-seat passenger, identified as appellant, was told to place his hands on the head-rest in front of him, but appellant did not immediately comply, instead moving around in the backseat.
 {¶ 20} Patrolman Saler testified that appellant had to be extracted from the car's backseat because he was kicking, grabbing the head-rest, and refusing to get out of the vehicle. As he was pulled out, his shoe came off. He continued to put his hands inside his sweat pants as he exited the vehicle. After the occupants were removed from the vehicle, it was impounded, and the officers searched it for a weapon. Patrolman Saler observed shell casings on the right rear passenger seat. Two additional shell casings were eventually found, one on the back seat and one under the passenger seat.
 {¶ 21} The three suspects were transported to Canton Police Department, and gunshot residue tests were conducted. Appellant's hands were swabbed at 7:20 a.m. Appellant told the officer performing the test that he had discharged a .22 caliber firearm approximately 1½ weeks prior to the incident. Mr. Fields stated that he had not fired a gun recently. Michael Mallettet stated that he had been hunting in an unknown place with an unknown firearm the week prior to the incident.
 {¶ 22} Crime lab personnel testified that examination of the kits revealed that Mallette tested positive for gunshot residue on his right palm. Appellant and Fields showed elevated amounts of lead and barium, but a "positive" test requires the third element of antimony, the element which is most easily removed. The lab personnel could not testify within a reasonable degree of scientific certainty that Mallette had fired a weapon, or that Fields and appellant had not fired a weapon. The residue test only indicates who is in the environment of a weapon being fired, and contact with fabric, such as putting one hand inside sweat pants, could affect the accuracy of the test.
 {¶ 23} Appellant told investigators that he would take them to the location where the weapon had been hidden. Police took him back to the scene of the shootings. Appellant led the officers on a circuitous route to 34th and Midvale Avenue N.E. Appellant showed them the wooded field where he said Mallette had secretly hidden the firearm. The police found the firearm lying in the woods, 10 to 20 feet away from the roadway. Appellant was cooperative with investigators, and provided a taped statement in which he said Michael Mallette was the shooter.
 {¶ 24} Criminalist Michael Short determined that all 8 shells and bullet fragments recovered at the scene were fired from the same gun, namely, the rifle recovered by the Canton Police Department.
 {¶ 25} Jason Hashman testified at trial that appellant was in the front passenger seat and yelled out the open window, "What now, punk, bitches." Mr. Hashman claims he saw the appellant's arm extend out the window, with what he described as a pistol or handgun in appellant's hand. Mr. Hashman stated that he saw a rifle too, and it looked like it came from the backseat, but he did not see who was holding it. Hashman provided appellant's name to the police at the hospital.
 {¶ 26} James Brady is a neighbor of John Cordia. Brady had observed the confrontation throughout the day as appellant and his various friends drove around the area and got into skirmishes with Cordia and his friends. Brady was not involved in the incident beyond telling the parties to stay off his grass; he felt the matter was none of his business. Brady watched the incident in which a small child was throne off Cordia's porch. Brady visited Cordia's house later that night to see how the child was doing. He stayed for about an hour and thus, was present when the shooting occurred. Brady was standing in Cordia's driveway when someone said something about a car coming their way. Brady heard someone say "Fuck it, Tony, show `em what we got." The instant Brady turned toward the direction of the car, he was shot 3 times. Brady did not see where the voices came from, and did not see the car or any guns.
 {¶ 27} Brian Francis was 13 years old at the time of the drive-by shooting. He is John Cordia's cousin, and was a friend of Jesse Blankenship. He was familiar with appellant prior to June 18, because they had met a week before at a graduation party. Francis went to Cordia's house that night with Chester McMaster because he had heard that John Cordia was going to be in a fight. Francis was standing near Jason Hashman when he observed the white car come around the corner and fire shots at the group. The car was directly beside him and he observed appellant with a gun in his hand. Francis noted that appellant had both hands on the gun. Francis saw another gun with a long barrel emerging from the back seat of the white car. He stated unequivocally that appellant was in the front passenger seat holding a small hand gun and identified appellant at trial.
 {¶ 28} Kenneth Ruiz is related to John Cordia and works as security at a bar. He also knows appellant and Jesse Blankenship. He arrived at Cordia's house between 11:30 p.m. and midnight. When he arrived, everything was quiet, but he testified appellant and his group kept driving by. Ruiz was 10 to 15 feet away from the car which had stopped under a street light. Ruiz saw appellant lean out the window and fire in the crowd. Ruiz saw appellant in the front passenger side of the vehicle. Ruiz noted that when appellant leaned out of the car, he had both hands on the gun. He saw fire and flame omit from the barrel of the gun. He was unable to see anyone else in the car.
 {¶ 29} A jury trial was held October 20-24, 2003. The jury heard testimony from 14 witnesses including appellant who testified in his own defense.
 {¶ 30} The jury returned verdicts of guilty on the charge of aggravated murder and on the four counts of felonious assault. The jury also found appellant guilty of all firearm specifications.
 {¶ 31} The trial court sentenced appellant to life in prison on the count of aggravated murder, with parole eligibility after twenty years. The court further sentenced appellant to an additional prison term of five years each for the four counts of felonious assault, and three years each on the four firearms specification, to be served consecutively.
 {¶ 32} Appellant filed a timely notice of appeal and herein raises the following five assignments of error for our consideration:
 {¶ 33} "I. The jury's verdicts were not supported by sufficient evidence and those verdicts were against the manifest weight of the evidence, where appellant was neither the principal offender nor an aider and abettor to the crimes.
 {¶ 34} "II. Appellant was denied a fair trial where the trial court admitted three gruesome autopsy photographs, which only served to inflame the jury.
 {¶ 35} "III. Appellant was denied a fair trial where, contrary to Evid. R. 402, 403 (a) and 404 (b), the trial court permitted the state to question appellant about a prior act in which he briefly possessed a handgun.
 {¶ 36} "IV. Appellant was denied his right to a fair trial due to prosecutorial misconduct, where the state proceeded on the theory that the appellant was the principal offender even though the evidence did not support that conclusion and later prosecuted another defendant as being the principal offender.
 {¶ 37} "V. The trial court imposition of consecutive sentences is not supported by the record and is otherwise contrary to law."
 I. {¶ 38} In his first assignment of error, appellant maintains the verdicts were against the sufficiency and manifest weight of the evidence. Appellant further argues that the application of the firearm specifications in his case with the resulting sentences were improper. We disagree.
 {¶ 39} Our standard of reviewing a claim a verdict was not supported by sufficient evidence is to examine the evidence presented at trial to determine whether the evidence, if believed, would convince the average mind of the accused's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt,State v. Jenks (1991), 61 Ohio St. 3d 259, 273, 574 N.E.2d 492,503.
 {¶ 40} The Supreme Court has explained the distinction between claims of sufficiency of the evidence and manifest weight. Sufficiency of the evidence is a question for the trial court to determine whether the State has met its burden to produce evidence on each element of the crime charged, sufficient for the matter to be submitted to the jury.
 {¶ 41} Manifest weight of the evidence claims concern the amount of evidence offered in support of one side of the case, and is a jury question. We must determine whether the jury, in interpreting the facts, so lost its way that its verdict results in a manifest miscarriage of justice, State v. Thompkins
(1997), 78 Ohio St. 3d 387, citations deleted. On review for manifest weight, a reviewing court is "to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment."
State v. Thompkins, 78 Ohio St. 3d 380, 387, 1997-Ohio-52, citing State v. Martin (1983), 20 Ohio App.3d 172, 175. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St. 2d 230, syllabus 1.
 {¶ 42} R.C. 2923.03(F) states "A charge of complicity may be stated in terms of this section, or in terms of the principal offense."
 {¶ 43} "The Supreme Court of Ohio clarified Ohio's position on the issue of complicity in State v. Perryman (1976),49 Ohio St. 2d 14, vacated in part on other grounds sub nom, Perryman v.Ohio (1978), 438 U.S. 911. The court unequivocally approved of the practice of charging a jury regarding aiding and abetting even if the defendant was charged in the indictment as a principal. Id. The court held that the indictment as principal performed the function of giving legal notice of the charge to the defendant. Id. Therefore, if the facts at trial reasonably supported the jury instruction on aiding and abetting, it is proper for the trial judge to give that charge. Perryman, supra at 27, 28." State v. Payton (April 19, 1990), 8th Dist. Nos. 58292, 58346. In the case at bar, the indictment charged appellant in terms of the principle offense and in terms of aiding and abetting.
 {¶ 44} Generally, a criminal defendant has aided or abetted an offense if he has supported, assisted, encouraged, cooperated with, advised, or incited another person to commit the offense. See State v. Johnson (2001), 93 Ohio St.3d 240, 754 N.E.2d 796, syllabus. "`Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'" State v. Mendoza (2000), 137 Ohio App.3d 336,342, 738 N.E.2d 822, quoting State v. Stepp (1997),117 Ohio App.3d 561, 568-569, 690 N.E.2d 1342.
 {¶ 45} R.C. 2923.03 provides:
 {¶ 46} "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
 {¶ 47} "* * *
 {¶ 48} "(2) Aid or abet another in committing the offense."
 {¶ 49} R.C. 2903.01(A) provides a definition of aggravated murder:
 {¶ 50} "No person shall purposely, and with prior calculation and design, cause the death of another. . . ."
 {¶ 51} R.C. 2903.11(A) provides a definition of felonious assault:
 {¶ 52} "(A) No person shall knowingly do either of the following:
 {¶ 53} "(1) Cause serious physical harm to another or to another's unborn;
 {¶ 54} "(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance * * *."
 {¶ 55} Three eyewitnesses testified to seeing appellant leaning out the passenger side window of the vehicle firing a small handgun. (2T. at 282-284; 312; 361-62; 374; 384; 395-396).
 {¶ 56} In the alternative, Appellant was not an innocent bystander who was merely along for the ride. By his own admission appellant returned to the area where the shootings occurred four times on the fatal night. (4T. at 738). Although he characterizes himself as a "peacemaker", appellant testified that the reason he went back to the area was "[a]nd they are saying how they want to go back down there and still fight them, and they just wanted to fight. They wanted to go back down there and fight them. So we headed back down there . . . Because they are, my friends were going back down there and they still wanted to fight and there were going down there and fight. If they was [sic] to get their ass beat and I wasn't there to get my ass beat with them, I wouldn't have felt right." (Id. at 688; 692; 739). Appellant actively recruited other individuals to return to the area and join the confrontation, including Leroy Mallette. (Id. at 693; 696-698). Appellant was present when the conversation turned to obtaining a gun. (Id. at 703-708; 751-754). Appellant was present when Leroy Mallette loaded the rifle. (Id. at 705; 754; 759). Appellant was present when Joey Mallette told Mike Mallette to "call your boys up, Call the dogs out . . ." (Id. at 701; 760).
 {¶ 57} Viewing this evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that, at the very least, appellant had aided and abetted in committed the crimes of aggravated murder and felonious assault.
 {¶ 58} We hold, therefore, that the state met its burden of production regarding each element of the crime of aggravated murder and felonious assault and, accordingly, there was sufficient evidence to support appellant's convictions.
 {¶ 59} Although appellant presented his statement to the police and testimony that he believed that the others were only going to scare the crowd with the rifle, and further that he unwilling accompanied the other individuals at the time of the shootings, the jury was free to accept or reject any and all of the evidence offered by the appellant and assess the witness's credibility. Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. State v. Jenks (1991), 61 Ohio St. 3d 259,574 N.E. 2d 492.
 {¶ 60} "Where only such unlawful act was contemplated in the original conspiracy, although not identical with or similar to the criminal act charged, if the conspired unlawful act and the manner of its performance would be reasonably likely to produce death, each conspirator is equally guilty with the principal offender, as an aider and abettor in the homicide, although such aider and abettor was neither present nor had knowledge of the physical killing or of the weapon used." State v. Doty (1916),94 Ohio St. 258, 113 N.E. 811, syllabus at para. 2.
 {¶ 61} Appellant was a willing participant in the actions leading up to the shootings. He actively recruited members to assist in the confrontation. He was aware that a loaded rifle had been obtained and was being transported to the scene.
 {¶ 62} "As stated in the opinion in Goins v. State,46 Ohio St. 457, 21 N.E. 476, there are many authorities which attach equal criminal responsibility if the killing was done in advancing the unlawful common design.
 {¶ 63} "This feature of the criminal law is founded upon the basic principle that persons engaged in an unlawful enterprise are presumed to acquiesce in whatever may be reasonably necessary to accomplish the object of the conspiracy; and if, under the circumstances, if might be reasonably expected that life might be endangered by the manner or means of performing the unlawful criminal act conspired, each is bound by the consequences naturally or probably arising in its furtherance, and in case of death would be guilty of homicide." State v. Doty, supra at 264, 113 N.E. at 813; State v. Black (1921), 103 Ohio St. 434,441, 133 N.E. 795, 797.
 {¶ 64} We conclude the jury, in resolving the conflicts in the evidence, did not create a manifest miscarriage of justice so as to require a new trial. Viewing this evidence in a light most favorable to the prosecution, we further conclude that a rational trier of fact could have found beyond a reasonable doubt that appellant, at a minimum, aided and abetted in the crimes of aggravated murder and felonious assault.
 {¶ 65} Accordingly, appellant's convictions for aggravated murder and felonious assault are not against the manifest weight of the evidence.
 {¶ 66} Appellant further contends that his convictions on the four firearm specifications were erroneous because the State failed to prove he had a firearm on or about his person or under his control. We disagree.
 {¶ 67} In State v. Willet, 5th Dist. No. CT2002-0024,2003-Ohio-6357, this court noted that an unarmed accomplice may be sentenced pursuant to a firearm specification: "[f]urthermore, in State v. Chapman (1986), 21 Ohio St.3d 41, 487 N.E.2d 566, the Ohio Supreme Court held that an unarmed accomplice to an armed robbery, convicted of violating R.C. 2911.01, may be sentenced to a mandatory three-year term under the penalty-enhancement provision of former R.C. 2929.71(A)(2), now R.C. 2929.14(D)(1). See also State v. Moore (1985),16 Ohio St.3d 30, 476 N.E.2d 355. The Ohio Supreme Court `reached the same conclusion in both cases, holding that an individual indicted for and convicted of violating R.C. 2911.01, aggravated robbery, and of a firearm specification under R.C. 2941.141, is subject to sentencing enhancement pursuant to former R.C.2929.71, regardless of whether he or she was the principal offender or an unarmed accomplice.' State v. Hanning,89 Ohio St.3d 86, 92, 2000-Ohio-436, 728 N.E.2d 1059. Thus, even if appellant sat in the car during the offenses, he is subject to a three year gun specification since his accomplices used a `long gun' during the commission of the offenses."
 {¶ 68} There is no dispute that a rifle was utilized in the attacks in appellant's case. Further three eyewitnesses to the shootings had testified that they saw appellant leaning out the passenger side car window and firing a small handgun. (2T. at 282-284; 312; 361-62; 374; 384; 395-396). Accordingly, appellant is subject to the three year gun specifications.
 {¶ 69} Appellant's first assignment of error is overruled.
 II. {¶ 70} Appellant, in his second assignment of error, argues that the trial court committed error by allowing the jury to view photographs of the decedent-victim. The photographs showed the surgical life saving measures that were used in an attempt to save the victims life and after his organs had been harvested for donation.
 {¶ 71} "When considering the admissibility of photographic evidence under Evid.R. 403, the question is whether the probative value of the photographic evidence is substantially outweighed by the danger of unfair prejudice to the defendant. See State v.Tingler (1972), 31 Ohio St.2d 100, 103-104, 60 O.O.2d 81, 83-84,285 N.E.2d 710, 713; State v. Rahman (1986), 23 Ohio St.3d 146,152, 23 OBR 315, 320, 492 N.E.2d 401, 407. The admission or exclusion of such photographic evidence is left to the discretion of the trial court. State v. Hill (1967), 12 Ohio St.2d 88, 41 O.O.2d 369, 232 N.E.2d 394, paragraph two of the syllabus; Statev. Wilson (1972), 30 Ohio St.2d 199, 203-204, 59 O.O.2d 220, 222, 283 N.E.2d 632, 636; State v. Tingler, supra. Accordingly, a trial court may reject an otherwise admissible photograph which, because of its inflammatory nature, creates a danger of prejudicial impact that substantially outweighs the probative value of the photograph as evidence. Absent such danger, the photograph is admissible." State v. Morales (1987),32 Ohio St.3d 252, 257, 513 N.E.2d 267, 273.
 {¶ 72} The fact a photograph is gruesome is not sufficient to render it inadmissible if the trial court, in the exercise of its discretion, feels it would prove useful to the jury. State v.Woodards (1966), 6 Ohio St.2d 14, 25, 215 N.E.2d 568. In Statev. Morales, supra, the Ohio Supreme Court determined that numerous gruesome photographs depicting a murder scene and the victim's body both before and during the coroner's examination were neither repetitive nor cumulative, and that the probative value of the photographs outweighed the danger of unfair prejudice to the defendant. Id. at 256, 513 N.E.2d 267. InState v. Landrum (1990), 53 Ohio St. 3d 107, 559 N.E.2d 710, the court reached the same conclusion with regard to a close-up photograph depicting the murder victim's slit throat. Id. at 121, 559 N.E.2d 710. State v. Woodward, 10th Dist. No. 03AP-398, 2004-Ohio-4418 at ¶ 50.
 {¶ 73} We have reviewed the record. The photographs all depict the wounds suffered by the victim. The photographs serve purposes that have time and again been found sufficiently probative to overcome their inherently disturbing nature. The photographs helped the jury appreciate the nature of the crimes, and they illustrated the coroner's testimony. See State v.Coley (2001), 93 Ohio St.3d 253, 266, 754 N.E.2d 1129; State v.Tibbetts (2001), 92 Ohio St.3d 146, 156-157, 749 N.E.2d 226;State v. Evans (1992), 63 Ohio St.3d 231, 250-251,586 N.E.2d 1042; State v. Arlt, 5th Dist. No. 2002CA00265, 2003-Ohio-1252 at ¶ 34.
 {¶ 74} Because of the drastic measures that had been taken in an attempt to save the victims life, it was not possible to obtain photographs that would only display the gunshot wounds. (4T. at 622).
 {¶ 75} Therefore, we conclude that, given the substantial probative value of the photographs and the fact that they were not particularly inflammatory, coupled with the consequent lack of any unfair prejudice to Appellant, the trial court did not abuse its discretion in admitting the three photographs into evidence. See Coley, 93 Ohio St.3d at 265, 754 N.E.2d 1129
("Decisions on the admissibility of photographs are `left to the sound discretion of the trial court,'" quoting State v. Slagle
(1992), 65 Ohio St.3d 597, 601, 605 N.E.2d 916). See, also,Landrum, 53 Ohio St.3d at 121, 559 N.E.2d 710; State v.Morales (1987), 32 Ohio St.3d 252, 513 N.E.2d 267.
 {¶ 76} Appellant's second assignment of error is overruled.
 III. {¶ 77} In his third assignment of error appellant contends that the trial court committed prejudicial error by permitting the State to question him about a prior act in which he possessed a small black handgun. Appellant urges this is evidence of prior criminal acts improperly introduced in violation of Evid. R. 404(B). We disagree.
 {¶ 78} Evid. R. 404(B) states: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." In State v. Broom
(1988), 40 Ohio St.3d 277, 533 N.E.2d 682, the Supreme Court held in addition to those reasons listed in the Rule, evidence of other bad acts may be admissible to prove identity. However, because Evid. R. 404(B), and R.C. 2945.59, codify an exception to the common law with respect to evidence of other acts of wrongdoing, they must be construed against admissibility, and the standard for determining admissibility of such evidence is strict, Broom, syllabus by the court, paragraph 1.
 {¶ 79} Appellant's defense at trial was at least in part that he had been mistakenly identified as the shooter, and that he had not handled a firearm on the night in question. (4T. at 724).
 {¶ 80} The trial court conducted a dialogue with counsel before permitting the State to elicit the testimony about appellant's prior handling of a small black handgun twelve days prior to the shootings in questions. (Id. at 726-27). The State argued that three of the eyewitnesses to the shootings had testified that they saw appellant leaning out the passenger side car window and firing a small handgun. (2T. at 282-284; 312; 361-62; 374; 384; 395-396). The court ruled the prosecution could inquire about the handgun in a limited fashion because the evidence was relevant to whether or not appellant had access to a weapon. (Id. at 728).
 {¶ 81} Appellant admitted that he had handled a small black pistol. (Id. at 730-31). Appellant further testified that he had disposed of the handgun the next day, which would have been ten to eleven days before the shootings in this case. (Id. at 767-769). Appellant's counsel did not request a limiting instruction.
 {¶ 82} In State v. Noling, 98 Ohio St.3d 44,2002-Ohio-7044, 781 N.E.2d 88, the Ohio Supreme Court held the admission of evidence is addressed to the broad discretion of the trial court, and a reviewing court shall not disturb evidentiary decisions in the absence of abuse of discretion resulting in material prejudice. The Supreme Court has repeatedly held the term abuse of discretion implies the trial court's attitude is unreasonable, arbitrary, or unconscionable, see, e.g., State v.Adams (1980), 62 Ohio St.2d 151, 404 N.E.2d 144.
 {¶ 83} Our review of the record leads us to conclude the trial court was well aware of the possible prejudice to appellant in admitting this evidence. This evidentiary ruling was a "close call", but the trial court very cautiously restricted the testimony in order to limit it as far as possible to the issue of whether appellant had accesses to a weapon as described by the eyewitnesses.
 {¶ 84} We find this evidence was relevant and appropriate to the issues in appellant's case. We further find that the trial court did not abuse its discretion in allowing the limited examination into the appellant's accessibility to a weapon similar to that described by the eyewitnesses.
 {¶ 85} Appellant's third assignment of error is overruled.
 IV. {¶ 86} In his fourth assignment of error, appellant maintains that the trial court erred by not requiring the State to elect between trying appellant as the "principal offender" or as an "accomplice". Appellant suggests that this amounts to prosecutorial misconduct because one of appellant's co-defendants was similarly charged and tried; however, the co-defendant was acquitted.
 {¶ 87} The test for prosecutorial misconduct is whether the prosecutor's conduct was improper and if so, whether that conduct prejudicially affected the substantial rights of the accused.State v. Lott (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293. In reviewing allegations of prosecutorial misconduct, it is our duty to consider the complained of conduct in the context of the entire trial. Darden v. Wainwright (1986), 477 U.S. 168,106 S.Ct. 2464, 91 L.Ed.2d 144.
 {¶ 88} Appellant argues that it was prosecutorial misconduct to prosecute him as the principal offender, and further not to require the prosecution to elect which theory that it was pursing. Appellant cites no authority to support this proposition.
 {¶ 89} As noted in Assignment of Error I, supra, it is well settled that an accomplice can be charged under either the complicity statute or as a principle offender. R.C. 2923.03(F) states: "A charge of complicity may be stated in terms of this section, or in terms of the principal offense." Thus, a defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission, even though the indictment is "stated * * * in terms of the principal offense" and does not mention complicity. R.C. 2923.03(F) adequately notifies defendants that the jury may be instructed on complicity, even when the charge is drawn in terms of the principal offense. See State v. Keenan (1998),81 Ohio St.3d 133, 151, 689 N.E.2d 929, 946, citing Hill v. Perini (C.A.6, 1986), 788 F.2d 406, 407-408. State v. Herring (2002),94 Ohio St.3d 246, 251, 762 N.E.2d 940, 949.
 {¶ 90} As noted in our disposition of Assignment of Error I, supra, the jury had sufficient evidence from which it could conclude that appellant did aid and abet another in the commission of aggravated murder and felonious assault as to each victim, regardless of whether the jury believed appellant to be the actual triggerman. Accordingly, appellant's focus that someone else was the actual triggerman is misplaced. "The fact that the General Assembly intended to equate the prosecution and punishment of principals, aiders, abettors, and procurers is clear from R.C. 2923.03, which provides that it is no defense to a charge of complicity that no person with whom the accused was in complicity has been convicted as a principal offender. R.C.2923.03(A) (2) and (F) provide that one who aids and abets another in committing an offense is guilty of the crime of complicity, and may be prosecuted and punished as if he were the principal offender. State v. Bell (1976), 48 Ohio St.2d 270,278, 358 N.E.2d 556. Aiding and abetting has been characterized as a substantive and independent offense so that aiders and abettors may be prosecuted and convicted as principals without the trial or conviction of the principal offender. Hartshorn v.State (1876), 29 Ohio St. 635.
 {¶ 91} "The federal rule that an aider and abettor is punishable as a principal is identical. Section 2, Title 18, U.S. Code; Reamer v. United States (C.A.6, 1955), 228 F.2d 906;Roberts v. United States (C.A.6, 1955), 226 F.2d 464." State v. Graven, supra, 52 Ohio St.2d at 115-116, 369 N.E.2d 1205,1207-1208.
 {¶ 92} The appellant on trial, whether characterized as an aider and abettor or principal, has been proven guilty by the evidence independently of the absent principal. The prosecution's theory and presentation of appellant's case was in no way dependant upon its theory and presentations of the cases of the co-defendants. Appellant cites no authority contra. The State's actions cannot be characterized as misconduct because they comport with the law in the State of Ohio as set forth above.
 {¶ 93} The appellant's fourth assignment of error is overruled.
 V. {¶ 94} In his fifth assignment of error, appellant maintains that the imposition of consecutive sentences in his case was manifestly unjust because his co-defendants received less severe punishment. Appellant concedes that the trial court record is sufficient to impose consecutive sentences in his case.
 {¶ 95} After the enactment of Senate Bill 2 in 1996, an appellate court's review of an appeal from a felony sentence was modified. Pursuant to present R.C. 2953.08(G) (2): "The court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings underlying the sentence or modification given by the sentencing court. The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for re-sentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion.
 {¶ 96} The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:
 {¶ 97} "(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (E) (4) of section 2929.14, or division (H) of section2929.20 of the Revised Code, whichever, if any, is relevant;
 {¶ 98} "(b) That the sentence is otherwise contrary to law."
 {¶ 99} Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v.Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 100} When reviewing a sentence imposed by the trial court, the applicable record to be examined by the appellate court includes the following: (1) the presentence investigation report; (2) the trial court record in the case in which the sentence was imposed; and (3) any oral or written statements made to or by the court at the sentencing hearing at which the sentence was imposed. R.C. 2953.08(F) (1) through (3). The sentence imposed, by the trial court, should be consistent with the overriding purposes of felony sentencing: "to protect the public from future crime by the offender" and "to punish the offender."
 {¶ 101} R.C. 2929.14 addresses consecutive sentencing guidelines. The statute permits consecutive prison terms if the court finds a consecutive sentence is necessary to protect the public from future crime or punish the offender, and that the consecutive sentencing is not disproportionate to the seriousness of the conduct and the danger the offender poses to the public. The court must also find either that the offender committed one or more of the multiple offenses while awaiting trial or sentencing, or while under post-release control; or at least two of the multiple offenses were part of a course of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual no one single term for any of the offenses committed adequately reflects the seriousness of the offender's conduct; or the offender's history of criminal conduct demonstrates the consecutive sentences are necessary to protect the public from future crime by the offender.
 {¶ 102} R.C. 2929.11(B) reads as follows: "(B). A sentence imposed for a felony shall be reasonably calculated to achieve the two overriding purposes of felony sentencing set forth in division (A) of this section, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders."
 {¶ 103} The court in State v. Ryan, Hamilton App. No. C-020283, 2003-Ohio-1188, applied principles set forth in an article by Judge Burt Griffin and Professor Lewis Katz clarifying for appellate courts the basic principles for achieving the overriding purpose of felony sentencing as: (1) reasonableness, (2) proportionality, and (3) consistency. Id., citing Griffin and Katz, Sentencing Consistency: Basic Principles Instead of Numerical Grids: The Ohio Plan (2002), 53 Case W.R.L.Rev. 1, 12. See also, State v. Georgakopoulos, 8th Dist. No. 81934, 2003-Ohio-4341 at ¶ 18.
 {¶ 104} In applying those principles, the court, citing Griffin and Katz, stated that "[t]he Ohio plan attempts to assure proportionality in felony sentencing through consistency. R.C.2929.11(B). Consistency, however, does not necessarily mean uniformity. Instead, consistency aims at similar sentences. Accordingly, consistency accepts divergence within a range of sentences and takes into consideration a trial court's discretion to weigh relevant statutory factors. The task of an appellate court is to examine the available data, not to determine if the trial court has imposed a sentence that is in lockstep with others, but to determine whether the sentence is so unusual as to be outside the mainstream of local judicial practice. Although offenses may be similar, distinguishing factors may justify dissimilar sentences." Ryan, supra at ¶ 10, (internal citations omitted). Further, the analysis noted: "An obstacle to appellate review for consistency of individual sentences under the Ohio plan is the current lack of acceptable sentencing data and records from which to determine the mainstream sentencing range for specific offenses. Absent such data, however, appellate courts can still compare similar cases for consistency in sentencing." Id. State v. Georgakopoulos, supra, at ¶ 19.
 {¶ 105} Simply pointing out an individual or series of cases with different results will not necessarily establish a record of inconsistency. State v. Gorgakopoulos, supra, at ¶ 23. The Ninth District Court of Appeals has stated: "[i]t is not the trial court's responsibility to research prior sentences from undefined, and largely unavailable, databases before reaching its sentencing decision. The legislature did not intend to place such a burden on the trial court when it enacted 2929.11(B). The legislature's purpose for inserting the consistency language contained in R.C. 2929.11(B) is to make consistency rather than uniformity the aim of the sentencing structure. See Griffin and Katz, Ohio Felony Sentencing Law (2001), 59. Uniformity is produced by a sentencing grid, where all persons convicted of the same offense with the same number of prior convictions receive identical sentences, Id. Consistency, on the other hand, requires a trial court to weigh the same factors for each defendant, which will ultimately result in an outcome that is rational and predictable. Under this meaning of `consistency,' two defendants convicted of the same offense with a similar or identical history of recidivism could properly be sentenced to different terms of imprisonment. Consequently, Appellant cannot establish, either at trial or on appeal, that his sentence is contrary to law because of inconsistency by providing the appropriate court with evidence of other cases that show similarly situated offenders have received different sentences than did he. Thus, the only way for Appellant to demonstrate that his sentence was "inconsistent," that is, contrary to law within the meaning of R.C. 2929.11(B), is if he establishes that the trial court failed to properly consider the factors and guidelines contained in R.C. 2929.12, R.C. 2929.13 and R.C. 2929.14. These sections, along with R.C.2929.11, create consistency in sentencing." State v. Quine,
Summit App. No. 20968, 2002-Ohio-6987at ¶ 12-13.
 {¶ 106} In State v. Hill (1994), 70 Ohio St.3d 23,635 N.E.2d 1248, the defendant was convicted of complicity to trafficking in marijuana, and sentenced to one year in prison and further ordered to forfeit his apartment complex. His co-defendant received probation instead of a prison sentence. Id. at 29, 635 N.E.2d at 1252. On appeal, he argued that the trial court abused its discretion by giving him a harsher sentence than was given his co-defendant. Id. The Ohio Supreme Court observed: "[t]here is no question that on its face the sentence received by appellant, when compared to Newbauer's punishment, is disproportionate. Given the fact that Newbauer received probation, appellant's one-year prison sentence does appear to be harsh. However, as a general rule, an appellate court will not review a trial court's exercise of discretion in sentencing when the sentence is authorized by statute and is within the statutory limits. See, generally, Toledo v. Reasonover (1965),5 Ohio St.2d 22, 24, 34 O.O.2d 13, 14, 213 N.E.2d 179, 180-181. See, also, State v. Cassidy (1984), 21 Ohio App.3d 100, 102, 21 OBR 107, 108-109, 487 N.E.2d 322, 323; State v. Burge (1992),82 Ohio App.3d 244, 249, 611 N.E.2d 866, 869; and State v. Grigsby
(1992), 80 Ohio App.3d 291, 302, 609 N.E.2d 183, 190.
 {¶ 107} "In the case sub judice, the trial court followed the sentencing scheme set forth by the General Assembly and apparently elected the median imprisonment permitted for a fourth-degree felony. See R.C. 2929.11(D) (2). The sentence was within the statutory limits and, for this reason, we will not interfere with the trial court's exercise of discretion." Id.
 {¶ 108} In State v. Comer, 99 Ohio St.3d 463,2003-Ohio-4165., the Supreme Court held a trial court is required to make its statutorily enumerated findings and give reasons supporting those findings at the sentencing hearing. The Supreme Court's opinion indicates its holding is not limited to cases like Comer, but rather, applies generally to all sentencing.
 {¶ 109} We note that we do not know the specific contents of the pre-sentence investigation report or any of the victim impact statements as appellant did not make them a part of the record. In State v. United (Mar. 5, 1998), Muskingum App. No. CT97-0018, we addressed the issue of failure to include the pre-sentence investigation report and stated: "Appellate review contemplates that the entire record be presented. App.R. 9. When portions of the transcript necessary to resolve issues are not part of the record, we must presume regularity in the trial court proceedings and affirm. Knapp v. Edwards Laboratories (1980),61 Ohio St.2d 197, 400 N.E.2d 384. The pre-sentence investigation report could have been submitted "under seal" for our review.
 {¶ 110} "Without the cited information and given the trial court (sic) findings on the record, we cannot say appellant's sentence was against the manifest weight of the evidence or `contrary to law." Id. at 7.
 {¶ 111} Appellant cites no precedent, or any other authority, for reversal of an otherwise valid sentence on the basis that more culpable co-defendants were not punished more severely. There is no requirement that co-defendant's receive equal sentences. State v. Lloyd, 11th Dist. No. 2002-L-069,2003-Ohio-6417 at ¶ 21; United State v. Frye (6th Cir., 1987), 831 F.2d 664, 667. Each defendant is different and nothing prohibits a trial court from imposing two different sentences upon individuals convicted of similar crimes. State v. Aguirre,
4th Dist. No. 03CA5, 2003-Ohio-4909 at ¶ 50. In this case, there is nothing in the record to show that the difference in appellant's sentence from those of similar offenders was the result of anything other than the individualized factors that were applied to appellant. State v. Beasley, 8th Dist. No. 82884, 2004-Ohio-988 at ¶ 23.
 {¶ 112} We reach the same conclusion, in the case sub judice, because appellant failed to include in the record the pre-sentence investigation reports and the victim impact statements.
 {¶ 113} Appellant has not argued and the record before us, such as it is, does not show that the trial court failed to comply with the consistency principles set forth in R.C. 2929.11, R.C. 2929.12, R.C. 2929.13, or R.C. 2929.14. We conclude that the trial court did not commit error when it sentenced Appellant to a term of imprisonment that differed from his co-defendants. We further conclude that the trial court made the necessary statutory findings for the imposition of consecutive sentences.
 {¶ 114} Accordingly, Appellant's sole assignment of error is overruled.
 {¶ 115} For the foregoing reasons, the judgment of the Court of Common Pleas of Stark County, Ohio, is affirmed.
Gwin, P.J., Wise, J., and Boggins, J., concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Stark County, Ohio, is affirmed. Costs to appellant.