[Cite as *State v. Mills*, 2011-Ohio-5793.]

IN THE COURT OF APPEALS FOR RICHLAND COUNTY, OHIO

FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | |
| | : | |
| v. | : | JUDGMENT ENTRY |
| | : | |
| JOHN MILLS | : | |
| | : | |
| Defendant-Appellant | : | CASE NO. 10CA119 |

This Judgment Entry reflects the Opinion that was filed on November 2, 2011. This Nunc Pro Tunc is being filed to correct an error on the cover page with the counsel's name for the Defendant-Appellant.

IT IS SO ORDERED.


_s/ Sheila G. Farmer_____


_s/ William B. Hoffman_____


_s/ Julie A. Edwards_____

JUDGES

[Cite as *State v. Mills*, 2011-Ohio-5793.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. William B. Hoffman, P.J. |
|     Plaintiff-Appellee | Hon. Sheila G. Farmer, J.<br>Hon. Julie A. Edwards, J. |
| v. | |
| JOHN MILLS | Case No. 10CA119 |
|     Defendant-Appellant | O P I N I O N |
| | NUNC PRO TUNC |

| | |
|---|---|
| CHARACTER OF PROCEEDING: | Appeal from the Court of Common Pleas,<br>Case No. 10CR299D |
| JUDGMENT: | Affirmed |
| DATE OF JUDGMENT: | November 9, 2011 |

APPEARANCES:

| For Plaintiff-Appellee | For Defendant-Appellant |
|---|---|
| JILL M. COCHRAN<br>38 South Park Street<br>Mansfield, OH 44902 | PATRICIA O'DONNELL KITZLER<br>3 North Main Street<br>Suite 801<br>Mansfield, OH 44902 |

*Farmer, J.*

{¶ 1}   On August 27, 2009, an argument ensued between appellant, John Mills, along with his sons, Kyle and Kameron Mills, and several members of a neighboring family, the Edwards Family.  The Edwards Family members involved in the altercation included Michael Edwards, his brother Mack Edwards, Jr. (hereinafter "Junior"), Michael's girlfriend Timberly Bowman, and her son Maverick Herritt.  Appellant's father, Jim Mills, arrived on the scene to defuse the situation.  During the melee, Jim was killed when he was struck by a board swung by his grandson Kameron.

{¶ 2}   On May 7, 2010, the Richland County Grand Jury indicted appellant on one count of aiding and abetting murder in violation of R.C. 2903.02(B), one count of aiding and abetting involuntary manslaughter in violation of R.C. 2903.04(A), and two counts of felonious assault in violation of R.C. 2903.11(A)(1) or (2), one with aiding and abetting language and one without.  A jury trial commenced on September 2, 2010. The jury found appellant guilty as charged except for the felonious assault count without the aiding and abetting language.  By judgment entry filed September 14, 2010, the trial court merged the murder and involuntary manslaughter convictions and sentenced appellant to an aggregate term of fifteen years to life in prison.

{¶ 3}   Appellant filed an appeal and this matter is now before this court for consideration.  Assignments of error are as follows:

I

{¶ 4}   "APPELLANT WAS DEPRIVED OF DUE PROCESS OF LAW AS GUARANTEED BY THE OHIO AND U.S. CONSTITUTIONS AS A RESULT OF THE INEFFECTIVE ASSISTANCE OF COUNSEL ARISING FROM FAILURE TO

EFFECTIVELY OBJECT TO OR LIMIT PREJUDICIAL 'OTHER ACTS' EVIDENCE; OR IN THE ALTERNATIVE, IT WAS PLAIN ERROR TO PERMIT THE STATE'S GRATUITOUS USE OF SUCH EVIDENCE."

II

{¶ 5} "APPELLANT'S CONVICTION ON CHARGES OF FELONY MURDER AND INVOLUNTARY MANSLAUGHTER ARE CONTRARY TO THE MANIFEST WEIGHT AND SUFFICIENCY OF EVIDENCE PRESENTED AT TRIAL, THUS DENYING APPELLANT A FAIR TRIAL AND DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE CONSTITUTION AND UNDER ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION."

III

{¶ 6} "THE TRIAL COURT'S REFUSAL TO INSTRUCT THE JURY THAT IT COULD CONSIDER SELF DEFENSE AS TO COUNTS I AND II CONSTITUTES ABUSE OF DISCRETION, OR IN THE ALTERNATIVE, PLAIN ERROR, THUS DEPRIVING APPELLANT OF DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND UNDER ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION."

{¶ 7} We will address Assignment of Error II relative to the sufficiency and manifest weight of the evidence first because the discussion impacts on Assignment of Error I.

II

{¶ 8} Appellant claims his convictions for aiding and abetting felony murder and involuntary manslaughter were against the sufficiency and manifest weight of the evidence. We disagree.

{¶ 9} On review for sufficiency, a reviewing court is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction. *State v. Jenks* (1991), 61 Ohio St.3d 259. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307. On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin* (1983), 20 Ohio App.3d 172, 175. See also, *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

{¶ 10} We note the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. Jamison* (1990), 49 Ohio St.3d 182, certiorari denied (1990), 498 U.S. 881. The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not

translate well on the written page." *Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 1997-Ohio-260.

{¶ 11} Appellant was found guilty of aiding and abetting felony murder and aiding and abetting involuntary manslaughter. R.C. 2903.03 defines aiding and abetting as follows:

{¶ 12} "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

{¶ 13} "(1) Solicit or procure another to commit the offense;

{¶ 14} "(2) Aid or abet another in committing the offense;

{¶ 15} "(3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;

{¶ 16} "(4) Cause an innocent or irresponsible person to commit the offense."

{¶ 17} Murder as it pertains to this case is defined in R.C. 2903.02(B) as, "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." Involuntary manslaughter as it pertains to this case is defined in R.C. 2903.04(A) as, "[n]o person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony." The underlying felony was felonious assault which is defined in R.C. 2903.11 as follows:

{¶ 18} "(A) No person shall knowingly do either of the following:

{¶ 19} "(1) Cause serious physical harm to another or to another's unborn;

{¶ 20} "(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."

{¶ 21} Generally, a criminal defendant has aided or abetted an offense if he has supported, assisted, encouraged, cooperated with, advised, or incited another person to commit the offense. *State v. Johnson,* 93 Ohio St.3d 240, 2001-Ohio-1336; *State v. Hickman,* Stark App. No.2003-CA-00408, 2004-Ohio-6760.

{¶ 22} The bill of particulars filed August 25, 2010 alleged the following:

{¶ 23} "COUNT I: **JOHN MILLS,** DOB: **01/31/1959,** SSN: **[XXX/XX/XXXX],** on or about the 27th day of August, 2009, at the County of Richland, while aiding and abetting another, did cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence, to-wit: Felonious assault, and that is not a violation of section 2903.03 or 2903.04 or the Revised Code, in violation of section 2903.02(B) of the Ohio Revised Code and against the peace and dignity of the State of Ohio.

{¶ 24} "John Mills solicited his sons Kameron and Kyle to assist him in assaulting various persons residing at 668 MCBride (sic) Road, including but not limited to Mack Edwards, Jr., Mack Edwards, Sr., Maverick Herritt, David Edwards, Michael Edwards, Timberly Bowman, etc.

{¶ 25} "John Mills, acting in complicity with his sons Kameron and Kyle Mills, fought with Mack Edwards, Jr. and members of his extended family. John Mills put Mack Edwards, Jr. in a choke hold and strangled him to near unconsciousness, and threatened to kill him with a knife held to this throat while his two sons kicked and struck Mr. Edwards repeatedly.

{¶ 26} "John Mills encouraged his sons to assault various members of the Edwards family. John Mills struck Maverick Herritt with a locust stick and punched him in the face as his sons struck Mr. Herritt with sticks, boards and possibly a piece of cinder-block.

{¶ 27} "John Mills encouraged and incited his son Kameron Mills into assaulting Timberly Bowman by striking her in the abdomen with a board. He taunted his father to fight with he and his sons and encouraged and incited his son Kameron Mills to strike James Mills in the head with a board; then struck James Mills in the head with a wooden object, killing him."

{¶ 28} The bill of particulars on the involuntary murder count mirrors these allegations.

{¶ 29} Appellant did not appeal the predicate offense of felonious assault; therefore, we find he conceded the conviction. What appellant contests is the finding that he aided and abetted in the murder/involuntary manslaughter of his father. Appellant argues the evidence failed to show that he "voiced encouragement to his sons during the melee, that he asked for their assistance, cheered them on, or did anything to solicit or incite them to violence." Appellant's Brief at 26. Appellant also argues his father's death was not the proximate result of the predicate offense of felonious assault, and there was no credible evidence that he initiated the altercation.

{¶ 30} In *State v. Dykas,* 185 Ohio App.3d 763, 2010-Ohio-359, ¶22-27, our brethren from the Eighth District explained the following:

{¶ 31} "In *State v. Robinson* (1994), 98 Ohio App.3d 560, 574, 649 N.E.2d 18, quoting *State v. Chambers* (1977), 53 Ohio App.2d 266, 272-273, 7 O.O.3d 326, 373 N.E.2d 393, we stated:

{¶ 32} " ' "Having found that the Ohio legislature intended to adopt the proximate cause theory of criminal liability, as to R.C. 2903.04, we hold that when a person, acting individually or in concert with another, sets in motion a sequence of events, the foreseeable consequences of which were known or should have been known to him at the time, he is criminally liable for the direct, proximate and reasonably inevitable consequences of death resulting from his original criminal act."  See, also, *State v. Younger* (May 31, 1990), Cuyahoga App. No. 57080, unreported, 1990 WL 71529.'

{¶ 33} "A defendant cannot be held responsible for consequences that no reasonable person could expect to follow from his conduct, but he will be held responsible for consequences that are direct, normal, and reasonably inevitable when viewed in the light of ordinary experience.  *State v. Losey* (1985), 23 Ohio App.3d 93, 95, 23 OBR 158, 491 N.E.2d 379.  It is not necessary that the defendant 'be in a position to foresee the precise consequence of his conduct; only that the consequence be foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by his conduct.'  Id. at 96, 23 OBR 158, 491 N.E.2d 379.

{¶ 34} "Only a reasonably unforeseeable intervening cause will absolve one of criminal liability in this context.  *State v. Lovelace* (1999), 137 Ohio App.3d 206, 215, 738 N.E.2d 418.  '[W]hen the result varied from the harmed [sic] intended or hazarded, it must be determined that the result achieved was not so extraordinary or surprising that

it would be simply unfair to hold the defendant criminally responsible for something so unforeseeable.' Id. at 216, 738 N.E.2d 418, citing LaFave & Scott, Criminal Law (1972), 246, Section 35.

{¶ 35} "In *State v. Ervin,* Cuyahoga App. No. 87333, 2006-Ohio-4498, 2006 WL 2507563, ¶25, quoting *State v. Dixon* (Feb. 8, 2002), Montgomery App. No. 18582, 2002 WL 191582, *5, we stated:

{¶ 36} " ' "Under the 'proximate cause theory,' it is irrelevant whether the killer was the defendant, an accomplice, or some third party such as the victim of the underlying felony or a police officer. Neither does the guilt or innocence of the person killed matter. [A] Defendant can be held criminally responsible for the killing regardless of the identity of the person killed or the identity of the person whose act directly caused the death, so long as the death is the 'proximate result' of Defendant's conduct in committing the underlying felony offense; that is, a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience." ' See also *Chambers,* 53 Ohio App.2d 266, 7 O.O.3d 326, 373 N.E.2d 393; *State v. Bumgardner* (Aug. 21, 1998), Greene App. No. 97-CA-103, 1998 WL 892120."

{¶ 37} It is conceded that the fact scenario in this case is very convoluted and confusing with some seven witnesses explaining their personal and limited observations of the incident. Appellant and all the witnesses from the Edwards Family testified to continued hostility and harassment between the families. T. at 233, 237, 325, 377-378, 509, 1248. Various incidents, disputes, and disharmony over time i.e., shutting off of

well water, driving by and flipping people off, name calling, cussing, spinning tires, throwing rocks, culminated in the events of August 27th.

{¶ 38} The altercation between the parties appears to have started by the cussing and name calling by appellant's sons Kyle and Kameron as Junior was walking to meet Timberly's son Maverick, who is mentally challenged, at the school bus. T. at 235, 237. After Junior returned with Maverick to their home, Kyle and Kameron drove by, cussing and hollering. T. at 238. The boys opened a gate and drove onto their own property. T. at 238-239. They then taunted the Edwards Family to "fucking come over here and make us shut up." T. at 240. The boys started throwing rocks and the Edwards Family threw some back, one of them breaking the taillight of the boys' vehicle. T. at 242-245, 380, 401. The boys took off in the vehicle and returned with appellant. T. at 380, 474. Appellant was carrying his walking stick and each boy had a board in their hands. T. at 246, 403.

{¶ 39} What is critical to the analysis in determining whether appellant aided and abetted in the murder and involuntary manslaughter of his own father are appellant's specific actions after he and his boys returned to the Edwards's home. It is not disputed that Kameron struck his grandfather with a board, causing his death. It is from this fact that appellant launches his challenge to the aiding and abetting charges against him.

{¶ 40} The state's theory of the case was that appellant encouraged, incited, solicited, and aided and abetted the melee that resulted in the death of James Mills:

{¶ 41} "The bottom line is none of this would have happened had John Mills not decided, 'That's enough of this shit, I'm taking my stick.' He wants you to believe that, I took my stick, I don't know what I was going to do with it, I just take it everywhere.

{¶ 42} "Now, his taillight has been busted. His sons have come to him complaining after a month of all this back and forth, F you, flipping off, throwing gravel, all this stuff going on, and, oh, well, I can't leave without my, let's see, make sure I got my cell phone, got my keys, got my walking stick, let's go down there and see if we can settle this. Let's go down there and find out who did it so we can call the cops.

{¶ 43} "You know why he took his stick. He took his stick because he's ready to go down there and beat some people. He didn't know, of course, that there were going to be eight or nine of them coming out. His intention clearly was to go down there and get Mack Edwards and beat the crap out of him, take his two boys. He didn't need Kaleb, Kaleb had been working, Kaleb is in bed, Kaleb is slow getting up getting his shoes on, whatever, they left him, they don't need him. The three of them could easily handle Mack Edwards and give him an education." T. at 1310-1311.

{¶ 44} The testimony supports this theory. Junior testified appellant, carrying a stick and flanked by Kameron and Kyle, each with a board in their hands, approached the Edwards's property. T at 246, 293. Upon exiting his house, Junior observed that his girlfriend Timberly and her son Maverick had been struck. T. at 248. He observed Kameron raising his board to strike Maverick again so he lunged at appellant and his sons. T. at 249. He knocked appellant over and one of the boys started hitting him with a board. Id. Thereafter, appellant started choking him and threatening his life. T. at 249-250. Junior passed out. T. at 250. When he came to, he broke free and saw everyone around Jim who was down on the ground. T. at 251.

{¶ 45} Junior's brother Michael observed Kameron strike Timberly with a board and then Kameron struck him. T. at 385. Michael saw appellant and Jim talking and

appellant running around Jim to confront Junior. T. at 404, 413. Michael heard appellant taunt Junior, stating "I want a piece of you." T. at 404-405, 413. Jim attempted to take the board out of Kyle's hands and Junior lunged at appellant and knocked him down. T. at 388, 406, 415. One of the boys started hitting and kicking Junior. T. at 388. Michael observed Jim standing with blood on the side of his face and then lying on the ground. T. at 389.

{¶ 46} Timberly testified to Kameron hitting her with a board. T. at 331. She observed Michael getting hit, Kameron striking Jim with a board, appellant choking Junior, and the boys hitting Junior as he was on the ground. T. at 333, 335, 337, 362.

{¶ 47} Maverick testified to observing appellant choking Junior and Kameron hitting Jim with a board. T. at 432, 434. Maverick testified that "Kyle hit me in my head, and Kameron hit me on my side and their dad punched me in the face with some kind of stick material." T. at 428.

{¶ 48} Junior's brother David Edwards testified when appellant and the boys returned to the property, he heard appellant say to Junior, " 'You know, I've had enough, come and get some,' or whatever he said, along them lines." T. at 532, 538. David observed all of the fighting, Jim coming down and taking a board from Kyle, and then the following:

{¶ 49} "Right after that happened, John got up in his [Jim's] face and started shaking a walking stick it looked like into his face. He started saying, 'Come on, hit me old man. I'm tired of you standing up for them all the time.' He said, 'Hit me old man,' that's what I remember from that point.

{¶ 50} "Then after that he [Jim] walked up, and he went to grab Kameron's two by four from him, and in the process, Kameron, when he did it, Kameron jerked back real hard like that and hit Jim."  T. at 520.

{¶ 51} David's girlfriend Amanda Wood testified that Jim was trying to stop the fighting and she overheard the following:

{¶ 52} "He [Jim] was saying, 'Stop, this is nonsense, we're neighbors, this doesn't need to go on.'  He went up to John, and I don't know what he said to John, but I know that John had his walking stick and was shoving it in his face and saying, 'Come on you old mother-fucker, hit me.  Come on you pussy, hit me.' "  T. at 478.

{¶ 53} Kameron and Kyle were there during this exchange.  T. at 502.  Thereafter, Amanda saw Jim try to stop Kameron and Kameron strike Jim with a board.  T. at 479, 482.

{¶ 54} Jim's grandson Gary Wilson observed cussing and rock throwing between Kameron and Kyle and members of the Edwards family.  T. at 806.  Appellant was not doing anything to stop his sons' behavior.  T. at 807.  In fact, appellant was "just standing there smiling."  Id.  Gary described appellant's actions as "egging them on to do it."  Id.

{¶ 55} Gary's mother and Jim's daughter Katherine Wilson testified to observing Kameron hit her father.  T. at 876.

{¶ 56} Jim's wife Sandra Mills testified to seeing her grandson Kameron hit his grandfather with the board.  T. at 991-992.  "[H]e swung it like a freaking golf club or a ball bat."  T. at 992.

{¶ 57} Appellant testified in his own defense. On direct, appellant explained how he reacted to hearing the taillight had been broken and how the altercation occurred as follows:

{¶ 58} "A. I said, 'That's enough of this shit. We're going to go up and we're going to fix this right now.'

{¶ 59} "Q. How were you going to fix it?

{¶ 60} "A. Well, we went up to find out who broke the taillight and we was going to call the sheriff.

{¶ 61} "Q. We heard some testimony that you grabbed your walking stick?

{¶ 62} "A. Yes.

{¶ 63} "Q. Why did you grab your walking stick?

{¶ 64} "A. I took it everywhere.

{¶ 65} "Q. I think Maverick Herritt said that you took it everywhere.

{¶ 66} "A. Yeah, just a habit.

{¶ 67} "Q. Okay. What about Kameron and Kyle, did they grab any kind of a stick or weapon?

{¶ 68} "A. No.

{¶ 69} "Q. And who drove?

{¶ 70} "A. I did.

{¶ 71} "Q. And I think there was some testimony from the Grand Jury that you flew down through the field?

{¶ 72} "A. Well, as fast as you can drive in a field.

{¶ 73} "***

{¶ 74} "Q. You go back down to the gate?

{¶ 75} "A. We drove through the creek and up to the gate, yeah.

{¶ 76} "Q. What happened when you got to the gate?

{¶ 77} "A. When we pulled up to the gate dad was at the gate chaining it shut. He said, 'There ain't going to be no trouble.' I said, 'I m going to find out who broke my fucking taillight, I'm going to the cops, they're going to jail.'

{¶ 78} "Q. What did your dad say?

{¶ 79} "A. He said, 'I don't want no trouble, just let it go.' I said, 'You might let them tear up your shit, but they ain't fucking my stuff up.'

{¶ 80} "Q. That's the way you talked to your dad?

{¶ 81} "A. Yep, that's the way I put it.

{¶ 82} "Q. What did Kameron and Kyle do?

{¶ 83} "A. When dad was locking the gate they jumped over the side of the fence next to the gate.

{¶ 84} "***

{¶ 85} "Q. Did you make it through the gate?

{¶ 86} "A. When dad went over to Kameron and Kyle because they jumped over the fence I opened the gate and went through the gate." T. at 1211-1213.

{¶ 87} Appellant claimed Junior admitted to breaking the taillight and "there wasn't going to be no fight" because he was going to call the police about the admission. T. at 1214-1215. Next thing appellant knows, Maverick came running at him and he hit Maverick in the face with his walking stick. T. at 1215-1217. Kyle then hit Maverick in the side of the head with a piece of cement block. T. at 1217. As

appellant turned to retreat, he saw Kameron hit Timerbly and Michael with a board.  T. at 1218.  Appellant threw his stick down and Junior hit him on the top of his head.  Id. Kyle hit Junior on the side of his head knocking him down and appellant put a choke hold on him.  T. at 1219.  Appellant then placed his unopened knife on his throat and told him he would "kill him because he wouldn't lay still.  I had enough."  T. at 1220. After letting Junior up, Junior mouthed-off so appellant decided he was going to "whoop his ass."  T. at 1221.  Appellant then testified to the following:

{¶ 88} "A. When I went after him [Junior] he turned around, dad was right behind him and he had his whopping stick, and when he turned around to run past dad he threw his arm up and run past dad and hit him in the side of the head and dad fell to the ground.

{¶ 89} "Q. So you are telling us Mack Edwards is the one that caused your father to fall to the ground?

{¶ 90} "A. Yes."  T. at 1221.

{¶ 91} Appellant did not see Kameron hit Jim.  T. at 1222.

{¶ 92} On cross-examination, appellant admitted that once he arrived at the Edwards's property, he "immediately started sizing up whose got who when this all starts."  T. at 1256.  Appellant did not tell his sons not to fight.  T. at 1256-1257.  He did not tell his sons to drop their boards.  T. at 1276.  Instead, appellant said, " 'You guys are going to get an education why you shouldn't have busted the taillight on my car.' " T. at 1257.  Appellant never told his sons to stop fighting.  T. at 1265-1266.  He admitted that his father Jim was trying to stop the fighting even before it started.  T. at 1273.

{¶ 93} The predicate offense in the involuntary manslaughter charge was felonious assault which appellant does not contest. The bill of particulars filed August 25, 2010, as to the involuntary manslaughter count, alleged appellant solicited his sons to assist him in the assault, and encouraged and incited his sons to participate in the melee.[1] We find the above cited testimony is more than sufficient to sustain the aiding and abetting of involuntary manslaughter.

{¶ 94} The predicate offense in the felony murder was also the felonious assault charge again, which appellant does not contest. The original disagreement with name calling and rock throwing was between Junior and appellant's boys. The boys went home and returned with appellant as their leader and undeniably the aggressor. As the cited evidence establishes, appellant came prepared for a fight. He flew through the field and confronted the Edwards Family with his two sons, each armed with a board. Appellant was holding his walking stick. He sized-up the Edwards Family and taunted Junior. He ignored his father's pleadings not to fight and did not tell his sons not to fight. By his actions, appellant set forth in motion a sequence of events with foreseeable consequences that he should have known would result in someone's death. Jim's death was "natural and logical in that it was within the scope of the risk created by his [appellant's] conduct." *Dykas,* quoting *Losey,* supra. Kameron striking his grandfather

---

[1] We note appellant was never charged with R.C. 2917.01, inciting to violence, as stated in appellee's brief at 21. Although appellant did not object, we note the trial court erred in so charging the jury. T. at 1293. However, we find the error to be harmless given the fact that the trial court merged the felony murder and involuntary manslaughter counts and sentenced appellant on the felony murder. Crim.R. 52(A); September 14, 2010 T. at 1374; Sentencing Entry filed September 14, 2010. In addition, aiding and abetting language parallels the language charged to the jury. See, ¶21, supra.

with the board and killing him was not extraordinary or surprising given the facts cited supra.

{¶ 95} Disregarding any character evidence presented, the overall tenor of the altercation was that appellant was the sole person in charge, initiated the return to the Edwards's property, and did nothing to stop his boys from participating in the melee which ultimately resulted in Jim's death.

{¶ 96} Upon review, we find sufficient credible evidence of aiding and abetting felony murder and involuntary manslaughter, and no manifest miscarriage of justice.

{¶ 97} Assignment of Error II is denied.

I

{¶ 98} Appellant claims he was denied the effective assistance of trial counsel for counsel's failure to object to "other acts" evidence.  We disagree.

{¶ 99} The standard this issue must be measured against is set out in *State v. Bradley* (1989), 42 Ohio St.3d 136, paragraphs two and three of the syllabus, certiorari denied (1990), 497 U.S. 1011.  Appellant must establish the following:

{¶ 100}       "2. Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance.  (*State v. Lytle* [1976], 48 Ohio St.2d 391, 2 O.O.3d 495, 358 N.E.2d 623; *Strickland v. Washington* [1984], 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, followed.)

{¶ 101}       "3. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable

probability that, were it not for counsel's errors, the result of the trial would have been different."

{¶ 102}     An error not raised in the trial court must be plain error for an appellate court to reverse. *State v. Long* (1978), 53 Ohio St.2d 91; Crim.R. 52(B).  In order to prevail under a plain error analysis, appellant bears the burden of demonstrating that the outcome of the trial clearly would have been different but for the error.  *Long.*  Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."  Id. at paragraph three of the syllabus.

{¶ 103}     Evid.R. 403(A) provides, "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."  Evid.R. 404 governs "character evidence" and states the following in pertinent part:

{¶ 104}     "**(A) Character evidence generally.** Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, subject to the following exceptions:

{¶ 105}     "**(1) *Character of accused.*** Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same is admissible; however, in prosecutions for rape, gross sexual imposition, and prostitution, the exceptions provided by statute enacted by the General Assembly are applicable.

{¶ 106}     "***

{¶ 107}     "**(B) Other crimes, wrongs or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show

action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶ 108}    The complained of evidence can be divided into two categories. The first is witness testimony concerning previous incidents involving appellant, and the second is opinion testimony about appellant's demeanor/character/propensity for violence.

{¶ 109}    Appellant complains of testimony elicited about him shooting his own dog, shutting off the water to the Edwards's home, drinking and drug abuse, Timberly's comment that appellant "got into it" with her brother, calling Junior's father a "deaf motherfucker," pointing a gun at Dana Keen, and riding his tractor with a shotgun. Appellant's Brief at 19-20.

{¶ 110}    The state argues the testimony was necessary background to show the extent and nature of the animosity between appellant and the Edwards Family. The testimony explains the defensive actions taken by Junior, Michael, and Maverick, and further explains why the Edwards Family immediately called "911" even after the first phase of name calling and rock throwing had passed.

{¶ 111}    R.C. 2945.59 governs proof of defendant's motive and states the following:

{¶ 112}    "In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan,

or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."

{¶ 113}     We conclude the complained of witness testimony was admissible as being relevant to explain the resulting melee.

{¶ 114}     The second type of evidence concerned appellant's character: his sister Katherine's opinion that he was "obnoxious, mean and nasty" and he cussed at his father every day, his mother Sandra's reference to his similarity to Charles Manson, and poor opinions from his former employer and various co-workers including "road rage," threats of "whooping" them, cussing, mouthy, ranting and raving, rude and belligerent, and name calling.  Appellant's Brief at 21-22.  The state used this testimony in closing argument to paint appellant's character and ability to manipulate and control his sons.

{¶ 115}     Appellant's sister Katherine's testimony detailed the background of the living arrangement in the Mills Family and the animosity of appellant and the boys toward the Edwards Family.  T. at 856-860, 862-866.  She explained why her father Jim attempted to control the situation between the families and why he intervened in the altercation.  Although her comment that appellant was obnoxious, mean, and nasty was unsolicited by the state, there is no doubt it was a comment on character that should not have been permitted under Evid.R. 404.

{¶ 116}     Appellant's mother Sandra described her lack of a relationship with appellant and appellant's animosity toward his father.  T. at 937-938.  She described the

atmosphere immediately preceding the altercation as "hell." T. at 947. When questioned about appellant's influence over his sons, she responded as follows:

{¶ 117} "A. When John stood up the boys stood up. When John took a step the boys took a step. When John sat down the boys sat down. I said if you put a swastika on his head he would be Charles Manson. This, this, this, this, this, this, that's what you do." T. at 952.

{¶ 118} This same testimony about the boys standing up and sitting down was given by Katherine. T. at 867.

{¶ 119} Sandra's comment was her insight into her own son's personality which could actually qualify as a lay witness opinion. Nevertheless, the comment was clearly unanticipated, not responsive, and prejudicial. However, we find the character comments do not rise to the level of plain error and did not affect the outcome of the trial. In examining the sufficiency and manifest weight issues in Assignment of Error II independent of the complained of comments, we found the evidence was sufficient and overwhelming regarding appellant's leadership role in the altercation.

{¶ 120} Assignment of Error I is denied.

III

{¶ 121} Appellant claims the trial court erred in not charging the jury on self-defense as to the murder/involuntary manslaughter counts. We disagree.

{¶ 122} The giving of jury instructions is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Martens* (1993), 90 Ohio App.3d 338. In order to find an abuse of discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and

not merely an error of law or judgment. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217. Jury instructions must be reviewed as a whole. *State v. Coleman* (1988), 37 Ohio St.3d 286.

{¶ 123} Crim.R. 30(A) governs instructions and states as follows:

{¶ 124} "At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. Copies shall be furnished to all other parties at the time of making the requests. The court shall inform counsel of its proposed action on the requests prior to counsel's arguments to the jury and shall give the jury complete instructions after the arguments are completed. The court also may give some or all of its instructions to the jury prior to counsel's arguments. The court need not reduce its instructions to writing.

{¶ 125} "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury."

{¶ 126} Because an objection was not made, we will review this assignment under the plain error doctrine. Crim.R. 52(B); *Long,* supra.

{¶ 127} As pointed out in Assignment of Error II, appellant did not challenge his felonious assault conviction which was the underlying crime of violence to the murder/involuntary manslaughter counts. Also in Assignment of Error II, we set forth appellant's testimony as to his reaction after being told his son's taillight was broken by

an Edwards Family member and the altercation that followed.  Appellant never claimed to be in fear of his life or asserted any form of self-defense as to Junior's attack.  In fact, appellant had him in a choke hold, held an unopened knife to his throat, and told him he was going to kill him.

{¶ 128}      Upon review, we conclude no evidence was presented to establish self-defense; therefore, the trial court did not err in not instructing the jury on the affirmative defense as to the murder/involuntary manslaughter counts.

{¶ 129}      Assignment of Error III is denied.

{¶ 130}      The judgment of the Court of Common Pleas of Richland County, Ohio is hereby affirmed.

By Farmer, J.

Edwards, J. concurs separately and

Hoffman, P.J. dissents.


_s/ Sheila G. Farmer_____


_____


_____

JUDGES

*Hoffman, P.J., dissenting*

(¶131) I respectfully dissent from the Majority's disposition of Appellant's second assignment of error.

(¶132) Appellant argues in his second assignment of error his convictions for felony murder and involuntary manslaughter are against the manifest weight and sufficiency of the evidence. Appellant was convicted of aiding and abetting felony murder and involuntary manslaughter in the death of Jim Mills.

(¶133) As can be seen from the record quoted in the Majority Opinion and as conceded by the Majority[2], it is difficult to draw a clear picture of the events that transpired that day. The testimony of the witnesses is often inconsistent and frequently contradictory. At what stage during the incident was Jim hit? Where was Jim when he was hit? Was Jim struck accidently or intentionally by Kameron? And finally why was Jim struck? The answers are unclear. As the Appellee aptly concedes in its brief to this Court "As a result of the myriad of statements, the exact sequence of events . . . is hard to pin down." (Appellee's brief at p.1).

(¶134) What this Court must determine is whether Appellant aided and abetted Kameron in Kameron's causing the death of Jim. More specifically, was Jim's death the proximate result of Appellant committing the predicate offense of either a felony offense of violence (felony murder) and/or any felony offense (involuntary manslaughter).

(¶135) R.C. 2923.03 requires death be a proximate result of the offender's commission of the underlying felony.

---

[2] Maj. Op. at Paragraph 37.

**(¶136)** "Defendant can be held criminally responsible for the killing regardless of the identity of the person killed or the identity of the person whose act directly caused the death, so long as the death is the 'proximate result' of Defendant's conduct in committing the underlying felony offense; that is, a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience. *Id; State v. Bumgardner* (August 21, 1998), Greene App. No. 97-CA-103, unreported; *State v. Lovelace* (1999), 137 Ohio App.3d 206, 738 N.E.2d 418." *State v. Dixon*, 2002-Ohio-541; See also, *State v. Tuggle* 2010-Ohio- 4162, citing *State v. Chambers* (1977), 53 Ohio App.2d 266, 269, 373 N.E.2d 393. *State v. Bumgardner*, supra, and *State v. Lovelace*, supra.

**(¶137)** In *State v. Lovelace,* 137 Ohio App.3d 206, the First District Court of Appeals determined for a defendant's conduct to be the proximate cause of a certain result, it must be determined 1) the conduct was the cause in fact of the result, meaning "but for" the conduct, the result would not have occurred, and 2) when the result was different than intended, it must be determined the result achieved was not so extraordinary or surprising it would simply be unfair to hold the defendant criminally responsible for something so unforeseeable. Id.

**(¶138)** Applying this case law to the evidence, I find Kameron's striking of his own grandfather (Jim) with the board was an extraordinary and surprising consequence of the underlying predicate offense; that being the commission of felonious assault against the Edwards' clan in general, and Mack, Jr., in particular. Though Appellant may have had argumentative words with his father before Appellant began the physical fray against the Edwards party, Jim was not the intended object of that predicate offense

and I believe it would be unfair to hold him criminally responsible for Kameron's actions based upon the circumstances of this case.

**(¶139)** More importantly, Kameron's blow to Jim was separate and apart from Appellant's felonious assault against Mack, Jr. and occurred after the offense against the Edwards' group had ended. It occurred as Kameron was leaving the fray. While there was evidence Appellant had significant influence over his sons, and John had little to no respect for, if not a hatred of, his father, I still find Kameron's striking Jim was an unexpected consequence of the underlying predicate offense and so attenuated as to render it insufficient to establish Jim's death was the proximate result of its commission.

**(¶140)** Clearly, there was sufficient competent credible evidence to support Appellant's conviction for committing a felonious assault against Mack Edwards, Jr. However, I find the evidence is insufficient to support a finding Jim Mill's death was the proximate result of Appellant committing the underlying predicate felony offense against Mack, Jr.

**(¶141)** I would sustain Appellant's second assignment of error.


_s/ William B. Hoffman_____
HON. WILLIAM B. HOFFMAN

EDWARDS, J., CONCURRING OPINION

{¶142} I concur with the disposition of this case by Judge Farmer.

{¶143} I write separately, though, because my analysis of the second assignment of error differs from that of Judge Farmer.  Both Judge Farmer and Judge Hoffman (in his dissent) separately seem to find that the predicate felony offense for the charges of felony murder and involuntary manslaughter was the felonious assault of Mack, Jr. by the appellant.

{¶144} From my review of the opening and closing arguments of counsel, I reach the conclusion that the primary theory of this case by the prosecution is that the appellant aided or abetted Kameron Mills in committing a felonious assault on Jim Mills which resulted in Jim Mills' death.  The predicate offense is the felonious assault by Kameron Mills against Jim Mills.  The State primarily[3] argued that appellant aided and abetted in this felonious assault by encouraging and inciting the felonious assault.  The prosecutor in opening statement said: "[Witnesses] are going to say Kameron killed his grandfather.  And they are going to say that John incited him to do it.  They are going to say John instigated it…"  T. Volume I, pgs. 210-211. The prosecutor further stated: "this is murder based on felonious assault that results in death. That's a fact that will be beyond a reasonable doubt.

{¶145} "The second thing that's going to be beyond a reasonable doubt is that Kameron Mills, John Mills' nineteen-year-old-son, had a big hand in it, and did it.

{¶146} "The third thing that is going to be there beyond a reasonable doubt, proved beyond a reasonable doubt, is that John Mills is as much responsible for it as

---

[3] The State also argued in closing statement that appellant hit Jim Mills even though Kameron was the one who landed the fatal blow.

anybody there that night.  He is the instigator.  He's the inciter.  He's the encourager. He's the solicitor.  He solicited these boys to go down there and give these people an education and not let anybody get in their way…"  T. Vol. I, pp 212-213.  Defense counsel understood that this was the state's theory of the case and said in opening statements: "And despite the prosecutor's theory, I don't think you are going to hear any evidence that John Mills said, 'Boys, let's get in the car and go down there and whip some ass.'  You are not going to hear that."

**{¶147}**  Similar arguments, illustrated by evidence from the trial, were made by both counsel in closing arguments.   The Prosecutor said "[Jim Mills] died because….[appellant] incited, influenced, inflamed and encourage his sons to use violence, and not let anyone, not even, quote, that stupid old son of a bitch, stop them or get in their way."  T. p. 1317.  Defense counsel responded: "There is no evidence that John solicited, instigated, encouraged, enticed or provoked his sons into going down there and fighting with the Edwards."  T. p. 1338.

**{¶148}** The wording of the indictment is difficult to understand.   It uses the wording from the statutes but is not clear as to what constituted the predicate felony offense.  The Bill of Particulars makes it clear that the State was alleging that appellant encouraged, solicited and incited his sons to commit assault/felonious assault.

**{¶149}** Jury instructions as given by the trial court are also consistent with the state's theory of the case: "The first thing he's charged with is complicity to commit murder as the result of a violent offense.  Before you can find him guilty of this crime you must find, beyond a reasonable doubt, that on or about August 27, 2009, here in Richland County, John Mills aided or abetted another in causing the death of James

Mills as a proximate result of John Mills, or the person he aided or abetted, committing felonious assault; or that he caused an irresponsible person to cause the death of James Mills as a proximate result of other person committing felonious assault; or the third alternative, that he solicited or procured another to cause the death of James Mills as a proximate result of committing felonious assault. . . . Aided or abetted means helped, supported, assisted, encouraged, cooperated with, advised or incited. An aider or abettor is to be prosecuted and punished as if he were the principal offender." T. p. 1288. "It's no defense to a charge of complicity that no person with whom John Mills was in complicity has been convicted as a principal offender." T. p. 1289.

{¶150} While I disagree with Judge Farmer's (and Judge Hoffman's) analysis that the predicate offense of the felony murder and involuntary manslaughter was appellant's assault on Mack, Jr. I do find that the verdict was based on sufficient evidence and not against the manifest weight of the evidence based on the State's theory that appellant aided or abetted Kameron Mills in the felonious assault that resulted in the death of Jim Mills by encouraging and inciting Kameron Mills to engage in the felonious assault actions.

{¶151} I concur with Judge Farmer as to her analysis and disposition of the first assignment of error.

{¶152} As to the third assignment of error, I concur with Judge Farmer as to the disposition of said assignment. But I differ regarding the analysis. Defense counsel argued throughout the trial that appellant and his sons just went to the Edwards' to find out who broke the taillight and then call the police, and that it was a large group of the Edwards' who came at appellant and his sons. Therefore, the defense argued, all acts

were committed in self-defense. Under a plain error analysis, I find no prejudicial error in defense counsel's failure to request a self-defense instruction regarding the felony-murder and the involuntary manslaughter. Based on the evidence of appellant's involvement in the melee, his initiation of the confrontation, the violent nature of Kameron's assault on Jim Mills and Jim Mill's unwavering attempts to prevent and/or stop the fight, I cannot conclude that but for counsel's failure to request this jury instruction, the results of the trial would have been different.

{¶153} In addition, appellant's counsel, in her brief, does not argue the above issue. She argues: "the instruction deprived the jury of the ability to logically reason that if it found self defense as to the two counts of felonious assault, it could therefore find its way to an acquittal on Counts I and II [felony-murder and involuntary manslaughter]." The jury did not find self-defense on at least one count of felonious assault. And, based on the actual theory of the case by the State, the conviction of appellant on one count of felonious assault was irrelevant to the conviction on the felony-murder and

manslaughter charges because the felonious assault charge for which appellant was convicted was not the predicate offense for the felony murder and involuntary manslaughter charges.

{¶154} Therefore, I would affirm the judgment of the trial court.


__s/ Julie A. Edwards_____

Judge Julie A. Edwards

[Cite as *State v. Mills*, 2011-Ohio-5793.]

IN THE COURT OF APPEALS FOR RICHLAND COUNTY, OHIO

FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | |
| | : | |
| v. | : | JUDGMENT ENTRY |
| | : | |
| JOHN MILLS | : | |
| | : | |
| Defendant-Appellant | : | CASE NO. 10CA119 |

For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Richland County, Ohio is affirmed. Costs to appellant.

_s/ Sheila G. Farmer_____


_s/ Julie A. Edwards_____


_____

JUDGES